**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| K.F.,<br>individually and on behalf of all others similarly situated,<br>Plaintiff,<br>*-against-*<br><br>MINDGEEK S.A.R.L. (n/k/a AYLO S.A.R.L.), a foreign entity;<br>MG FREESITES, LTD. (n/k/a AYLO FREESITES LTD.), d/b/a PORNHUB, a foreign entity; MG FREESITES II, LTD., a foreign entity; MG CONTENT RT LIMITED, a foreign entity;<br>MINDGEEK USA INCORPORATED (n/k/a AYLO USA INCORPORATED), a Delaware corporation;<br>MG PREMIUM LTD. (n/k/a AYLO PREMIUM LTD.), a foreign entity;<br>MG GLOBAL ENTERTAINMENT INC. (n/k/a AYLO GLOBAL ENTERTAINMENT, INC.), a Delaware corporation;<br>9219-1568 QUEBEC, INC. d/b/a MINDGEEK, a foreign entity;<br>RK HOLDINGS USA INC., a Florida corporation;<br>TRAFFICJUNKY INC., a foreign entity;<br>BERND BERGMAIR, a foreign individual;<br>FERAS ANTOON, a foreign individual;<br>DAVID TASSILLO, a foreign individual;<br>COREY URMAN, a foreign individual; and<br>JOHN AND JANE DOES 1-10,<br>Defendants. | Case No. 26-5912<br><br>CIVIL COMPLAINT<br>DEMAND FOR JURY TRIAL |

Plaintiff K.F. ("Plaintiff"), individually and on behalf of all others similarly situated, by and through her undersigned counsel, T.A. Blackburn Law, PLLC, for her Complaint against MindGeek S.a.r.l. (n/k/a Aylo S.a.r.l.); MG Freesites, Ltd. (n/k/a Aylo Freesites Ltd.) d/b/a Pornhub ("Pornhub"); MG Freesites II, Ltd.; MG Content RT Limited; MindGeek USA Incorporated (n/k/a Aylo USA Incorporated) ("MindGeek USA"); MG Premium Ltd. (n/k/a Aylo Premium Ltd.); MG Global Entertainment Inc. (n/k/a Aylo Global Entertainment, Inc.); 9219-1568 Quebec, Inc. d/b/a MindGeek; RK Holdings USA Inc.; TrafficJunky Inc. d/b/a TrafficJunky.com (collectively, "MindGeek" or "Defendants"); and individual defendants Bernd Bergmair, Feras Antoon, David Tassillo, and Corey Urman (together with MindGeek, the "MindGeek

Defendants"), for sex trafficking in violation of 18 U.S.C. §§ 1591 and 1595, for receipt, transportation, distribution, and possession of child pornography in violation of 18 U.S.C. §§ 2252, 2252A, and 2255, and for related state statutory and common-law violations, alleges as follows:

**INTRODUCTION**

1. This is a case about the sexual exploitation of a child, not pornography. It is a case about a multinational pornography conglomerate that knowingly profited, for years, from videos depicting Plaintiff and similarly situated members of the Class — girls who were sixteen and seventeen years old when the images at issue were created — engaging in sexual acts without their knowledge or consent, and that continued to profit from those images even after Plaintiff's counsel repeatedly notified Defendants, in writing, that Plaintiff had been a minor and demanded permanent removal.
2. Rather than permanently removing the unlawful content, Defendants engaged in a calculated pattern familiar to survivors across the country and repeatedly documented in related federal litigation against these same Defendants: they temporarily disabled a reported link, allowed the underlying file to remain on their servers and mirrored on affiliated and third-party "tube sites," and permitted the content to reappear — again and again — under new titles, new URLs, and on affiliate platforms such as PornMD.com and redwap.tv, including as recently as the filing of this Complaint at the URL redwap.tv/xvideos/video-59774653/(REDACTED)-(REDACTED)-(REDACTED)-wife.
3. Defendants' "whack-a-mole" business practice is not an accident. It is a direct and foreseeable consequence of a business model that Defendants and their officers designed, knowingly maintained, and refused to fix even after being placed on actual notice — repeatedly, by name, and with reference to Plaintiff's minority — because permanent removal reduces the traffic, advertising revenue, and subscription revenue Defendants derive from non-consensual and unlawful content.
4. As a direct and proximate result of Defendants' conduct, Plaintiff — a former law enforcement officer and the child of two retired police officers — has been rejected from at least six subsequent law enforcement and public-safety job opportunities, including two Florida law enforcement agencies that rescinded conditional offers of employment in August and November 2024 respectively, because the background check conducted in connection with each application surfaced the very content Defendants promised, and failed, to remove. She

has been diagnosed with Post-Traumatic Stress Disorder and Adjustment Disorder directly attributable to Defendants' conduct, and her minor son has been bullied and suspended from school because of the continued availability of this content online.

5. Plaintiff brings this action individually and on behalf of a class of similarly situated individuals, as defined below, to hold Defendants accountable, to compel the permanent removal of all content depicting Plaintiff and the Class, and to recover the damages Defendants' knowing and continuing misconduct has caused.

## PARTIES

**Plaintiff**

6. Plaintiff K.F. is an individual who has reached the age of majority and resides in Brooklyn, New York, within this District. As alleged herein, Plaintiff is a survivor of child sexual exploitation and the non-consensual dissemination of intimate images. At the time the videos at issue were created, in and around December 2020 and before, Plaintiff was sixteen and seventeen years old.

7. Plaintiff proceeds under the pseudonymous initials "K.F." and will contemporaneously move this Court for leave to proceed under pseudonym, with her identity disclosed to the Court and Defendants pursuant to a protective order.

8. Pseudonymous proceeding is warranted under the factors set forth in Sealed Plaintiff v. Sealed Defendant, 537 F.3d 185, 190 (2d Cir. 2008), because, among other things: this litigation involves matters of a highly sensitive and personal nature, namely child sexual abuse material and non-consensual intimate images; identification poses a risk of retaliatory or further exploitative conduct, including further non-consensual dissemination of the very material at issue; identification would expose Plaintiff, a survivor of child sexual exploitation, to additional psychological harm; and Defendants will suffer no prejudice from Plaintiff's use of initials, as Defendants already possess actual knowledge of Plaintiff's identity from the pre-suit correspondence identified in Table A, below.

**Defendants**

9. Defendant MindGeek S.a.r.l. (n/k/a Aylo S.a.r.l.) ("MindGeek S.a.r.l.") is a foreign entity (a société à responsabilité limitée) organized and existing under the laws of Luxembourg, with a registered address at Boulevard Royal, 2449 Luxembourg. MindGeek S.a.r.l., formerly known as Manwin, owns and/or operates over 100 pornographic websites, production companies, and brands, including Pornhub, RedTube, Tube8, YouPorn, PornMD, Xtube, Brazzers, Reality

Kings, Digital Playground, and Twistys, and although incorporated in Luxembourg, operates principally out of Montreal, Canada, with satellite offices including in Los Angeles, California. MindGeek S.a.r.l. conducts continuous and systematic business in the United States, including in this District.

10. Defendant MG Freesites, Ltd. (n/k/a Aylo Freesites Ltd.) ("MG Freesites") (d/b/a Pornhub) is a foreign company organized under the laws of the Republic of Cyprus, with a principal place of business at 195-197 Old Nicosia-Limassol Road, Block 1, Dali Industrial Zone, Cyprus 2540. MG Freesites is a wholly owned subsidiary of MindGeek S.a.r.l., is controlled and operated by directors, officers, and employees working in MindGeek's offices in the United States and Canada, and maintains servers containing its content library in, among other places, Waltham, Massachusetts. MG Freesites conducts continuous and systematic business in the United States, including in this District.

11. Defendant MG Freesites II, Ltd. is a foreign company organized under the laws of the Republic of Cyprus and, upon information and belief, is a corporate affiliate of MG Freesites created to hold or operate portions of the Pornhub content library and infrastructure, conducting business throughout the United States, including in this District.

12. Defendant MG Content RT Limited is a foreign company organized under the laws of Ireland which, upon information and belief, hosts, stores, or processes content for one or more MindGeek-operated websites, and conducts business throughout the United States, including in this District.

13. Defendant MindGeek USA Incorporated (n/k/a Aylo USA Incorporated) ("MindGeek USA") is a corporation organized under the laws of the State of Delaware. MindGeek USA is a wholly owned subsidiary of MindGeek S.a.r.l., either directly or through intermediary companies also controlled by MindGeek S.a.r.l. and conducts continuous and systematic business in the United States, including in this District.

14. Defendant MG Premium Ltd. (n/k/a Aylo Premium Ltd.) ("MG Premium") is a foreign company organized under the laws of the Republic of Cyprus, with a principal place of business at 195-197 Old Nicosia-Limassol Road, Block 1, Dali Industrial Zone, Cyprus 2540. MG Premium is a wholly owned subsidiary of MindGeek S.a.r.l. and conducts continuous and systematic business in the United States, including in this District.

15. Defendant MG Global Entertainment Inc. (n/k/a Aylo Global Entertainment, Inc.) is a corporation organized under the laws of the State of Delaware and a wholly owned subsidiary of MindGeek S.a.r.l., conducting continuous and systematic business in the United States, including in this District.

16. Defendant 9219-1568 Quebec, Inc. d/b/a MindGeek is a foreign company organized under the laws of Canada, with a principal place of business at 7777 Décarie Boulevard, Office 300, Montreal, Quebec H4P 2H2, and is a corporate affiliate and/or alter ego of MindGeek S.a.r.l., conducting continuous and systematic business in the United States, including in this District.

17. Defendant RK Holdings USA Inc. ("RK Holdings") is a corporation organized under the laws of the State of Florida and, upon information and belief, is a wholly owned subsidiary or affiliate of MindGeek S.a.r.l., conducting business throughout the United States, including in this District.

18. Defendant TrafficJunky Inc. (d/b/a TrafficJunky.com) is a company organized under the laws of Canada with a principal place of business in Montreal and is a wholly owned subsidiary or affiliate of MindGeek S.a.r.l. that operates the advertising network through which Defendants monetize content on their websites, conducting business throughout the United States, including in this District.

19. Defendant Bernd Bergmair (also known as Bernard Bergemar and Bernard Bergemair) is, upon information and belief, a resident of Hong Kong and the beneficial majority owner of the MindGeek enterprise. Upon information and belief, as the enterprise's controlling beneficial owner throughout the period relevant to this Complaint, Bergmair had ultimate authority over, and knowingly approved, the resource allocation, staffing, and business-model decisions — including the decision not to fund meaningful age- and consent-verification measures and not to permanently delete reported unlawful content — that caused the harm to Plaintiff and the Class alleged herein.

20. Defendant Feras Antoon is, upon information and belief, a resident of Canada and a co-owner and former Chief Executive Officer of MindGeek. Upon information and belief, as Chief Executive Officer, Antoon had direct authority over, and personal knowledge of, Defendants' content-moderation practices, including the practice of disabling rather than permanently deleting reported non-consensual and underage content, and personally directed or ratified the

business decisions that prioritized traffic and revenue over permanent removal of the content depicting Plaintiff and the Class.

21. Defendant David Tassillo is, upon information and belief, a resident of Canada and a co-owner and former Chief Operating Officer of MindGeek. Upon information and belief, as Chief Operating Officer, Tassillo had direct operational authority over Defendants' content-moderation, trust-and-safety, and takedown-response functions, including the functions responsible for processing the takedown demands described in Table A below, and personally directed or ratified the operational practices that resulted in the repeated reappearance of content depicting Plaintiff and the Class.

22. Defendant Corey Urman is, upon information and belief, a resident of Canada and Vice President, Product Management, Video Sharing Platform, of MindGeek. Upon information and belief, in that role, Urman had direct responsibility for the design and operation of the upload, "verification," and content-propagation systems — including the systems by which content uploaded to Pornhub is copied or made available to affiliated sites such as PornMD.com and RedTube — through which the content depicting Plaintiff and the Class was uploaded, distributed, and repeatedly reuploaded.

23. Defendants John and Jane Does 1-10 are individuals or entities whose precise roles, identities, and citizenship are presently unknown to Plaintiff, who financed, directed, participated in, and/or otherwise facilitated the wrongful conduct described herein, and who will be named by amendment once their identities are ascertained through discovery.

24. In 2023, MindGeek was purportedly sold to Ethical Capital Partners, a Montreal-based entity, and MindGeek's operating subsidiaries were rebranded under the "Aylo" name in or around August 2023. Upon information and belief, the individuals and entities that owned, controlled, and profited from MindGeek before the purported sale continue to own, control, and/or profit from the rebranded Aylo entities, which continue to operate the same websites — including Pornhub — from which the content depicting Plaintiff has never been permanently removed.

25. MindGeek S.a.r.l., MG Freesites, MG Freesites II, MG Content RT Limited, MindGeek USA, MG Premium, MG Global Entertainment, 9219-1568 Quebec, RK Holdings, and TrafficJunky have incorporated dozens of subsidiaries and sister companies worldwide. Upon information and belief, all such entities operate as a single, integrated business enterprise dedicated to producing, distributing, and monetizing pornography on the internet, sharing officers,

directors, employees, funds, and physical infrastructure, failing to maintain corporate separateness, and treating one another's assets, revenues, and personnel as their own, such that recognition of any separateness among them would sanction fraud and promote injustice. Each such Defendant is accordingly jointly and severally liable herein as the alter ego of the others.

26. At all times relevant herein, each of the MindGeek Defendants was the agent, servant, representative, partner, joint venturer, affiliate, parent, subsidiary, and/or employee of each of the other MindGeek Defendants, and each acted within the course and scope of that relationship and with the permission, authorization, consent, and ratification of the others.

## JURISDICTION AND VENUE

27. This action arises under the Trafficking Victims Protection Act ("TVPA"), 18 U.S.C. §§ 1589-1595, and federal child pornography and sexual exploitation laws, 18 U.S.C. §§ 2252, 2252A, and 2255, as well as related state statutes and common law.

28. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States and has supplemental jurisdiction over the pendent state-law claims alleged herein pursuant to 28 U.S.C. § 1367 because those claims arise from the same case or controversy.

29. This Court has personal jurisdiction over each Defendant pursuant to 18 U.S.C. § 2255(c)(2), which authorizes service of process in any district in which a Defendant is an inhabitant or may be found in connection with claims arising under 18 U.S.C. §§ 2255 and 1595, and, as to any Defendant not otherwise subject to the jurisdiction of the courts of general jurisdiction of any state, pursuant to Federal Rule of Civil Procedure 4(k)(2), because Defendants have sufficient minimum contacts with the United States as a whole and this action arises under federal law. Each Defendant, directly or through its agents, transacts business on a systematic and continuous basis throughout the United States, including in this District; has committed tortious acts and omissions directed at and causing injury within this District; derives substantial revenue from services rendered to and content uploaded by residents of this District and this State; and purposefully directed the conduct alleged herein at, among others, a New York resident whose counsel is and was located in this District, such that the exercise of personal jurisdiction over Defendants comports with due process and does not offend traditional notions of fair play and substantial justice.

30. Defendants maintain an established place of business in the United States, market and sell subscription and advertising products to New York residents, including residents of this District, and their websites — including Pornhub, RedTube, and PornMD — are among the most visited websites by residents of the State of New York and this District. Defendants collectively transmit millions of videos and images to and from this District annually and derive substantial advertising and subscription revenue from users located in this District.

31. All of the correspondence by which Plaintiff, through her counsel, placed Defendants on actual notice of her minority and demanded permanent removal of the content at issue was transmitted from counsel's office in Brooklyn, New York, within this District, and Defendants' responses to that correspondence were received in this District. A substantial part of the events and omissions giving rise to the claims herein — including the transmission and receipt of the takedown demands identified in Table A, below, and Defendants' knowing failure to comply with them — occurred in this District.

32. Jurisdiction is further proper under 18 U.S.C. § 1596, which provides for extraterritorial jurisdiction over violations of 18 U.S.C. §§ 1591 and 2252 wherever the offender is a national of, or is present in, the United States, or where the offense was intended to occur in whole or in part within the United States, irrespective of the nationality of the alleged offender.

33. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in this District, and pursuant to 18 U.S.C. § 2255(c)(1), which provides that any action brought under 18 U.S.C. § 2255(a) may be brought in the district court of the United States that meets applicable venue requirements under 28 U.S.C. § 1391, given that Plaintiff resides in this District, Defendants transact business throughout the United States, and Plaintiff's counsel and the relevant correspondence are located in this District.

34. This action is not barred by 47 U.S.C. § 230. Congress expressly excluded claims arising under federal criminal sex-trafficking and child-exploitation statutes — including 18 U.S.C. §§ 1591, 1595, 2252, and 2252A — from the scope of Section 230 immunity. See 47 U.S.C. § 230(e)(1), (e)(5) (added by the Allow States and Victims to Fight Online Sex Trafficking Act of 2017 ("FOSTA"), Pub. L. No. 115-164, 132 Stat. 1253).

35. Upon information and belief, Section 230 likewise does not immunize Defendants' conduct as to Plaintiff's state-law claims because Defendants, through their curation, promotion,

propagation to affiliated platforms, and monetization of the content at issue, acted as an information content provider, in whole or in part, of the unlawful content depicting Plaintiff and the Class, and because Defendants' own conduct — not merely third-party content — forms the basis of the claims asserted herein. An interactive computer service becomes an information content provider, and forfeits Section 230 immunity as to all claims, where it "contributes materially to the alleged illegality" of the content at issue, rather than merely augmenting content generally. Fair Hous. Council v. Roommates.com, LLC, 521 F.3d 1157, 1167-68 (9th Cir. 2008) (en banc).

36. Applying that standard to these same Defendants on materially indistinguishable allegations, the court in Fleites v. MindGeek S.a.r.l., No. 2:21-cv-04920-WLH-ADS (C.D. Cal. Sept. 26, 2025), held that Defendants are not entitled to Section 230 immunity because their conduct — including employee-driven tagging and categorization of content with coded search terms, maintaining webpages and thumbnails for disabled videos to preserve traffic, and systematically facilitating the reupload of previously disabled content — constitutes "affirmative conduct" beyond that of a "passive transmitter of information provided by others," and that this abrogation of immunity extends to all of a plaintiff's federal and state-law claims, not merely TVPRA claims. See also Doe v. MindGeek USA Inc., 558 F. Supp. 3d 828, 837 (C.D. Cal. 2021), adhered to on reconsideration, 574 F. Supp. 3d 760, 767-75 (C.D. Cal. 2021) (same Defendants; MindGeek's conduct, including soliciting, reviewing, approving, and featuring illicit videos and assisting uploaders with anonymization tools, went far beyond employing neutral tools).

37. Upon information and belief, Defendants engaged in the same category of affirmative, content-shaping conduct as to the content depicting Plaintiff, including featuring it on Pornhub's front page, propagating it to affiliated sites, and facilitating its repeated reupload notwithstanding actual notice, such that Defendants are not entitled to Section 230 immunity for the same reasons set forth in the MindGeek line of cases.

## FACTUAL ALLEGATIONS

a. **Defendants' Business Model**

38. Defendants operate a series of commonly controlled companies that own and/or operate many of the most-visited pornographic websites in the world, including Pornhub, RedTube, and

YouPorn, and adult film production companies including Brazzers, Digital Playground, and Reality Kings.

39. As Defendants' own leadership explained in a 2021 letter to the Canadian Parliament, Pornhub is "a leading free, ad-supported adult content hosting and streaming website, offering visitors the ability to view content uploaded by verified users, models, and third-party adult entertainment companies," with a "Pornhub Premium" subscription service.

40. In 2019, Pornhub received approximately 42 billion visits — an average of 115 million visits per day — making it, by Defendants' own account, one of the most-visited websites in the world, ahead of Wikipedia.org and Zillow.com. According to analytics Defendants have published, the United States is the top country by volume of Pornhub usage, and New York is consistently among the top-ranked cities by volume of usage.

41. In their own 2021 letter to Canadian Parliament, Defendants' executives wrote that "demand for MindGeek's content rivals that of some of the largest social media platforms," noting that in 2020 alone, Pornhub averaged over 4 million unique user sessions per day in Canada, "equivalent to over 10% of the adult Canadian population."

b. **Defendants' Platform Design Invites Non-Consensual and Underage Content**

42. The centerpiece of Pornhub's platform is a searchable video library; as of the filing of this Complaint, Pornhub hosts millions of pornographic videos in its free video library.

43. Pornhub and Defendants' other websites are "tube sites" — meaning their interfaces resemble YouTube's, with individual users, rather than professional studios, uploading the overwhelming majority of content.

44. Until Defendants altered their upload process in late 2020 in response to public and financial-industry pressure (described below), any user could create an account, click an upload button, and post any video or image within minutes, without demonstrating that they owned any copyright in the content, that the individuals depicted had consented, or that the individuals depicted were adults.

45. Defendants' "Model Program" and "ModelHub" verification processes required only that a user upload a photograph of a person holding a piece of paper bearing a username and the word "pornhub.com." Upon information and belief, at all times relevant to this action, Defendants required no government-issued identification, no birthdate, and no independent confirmation of the age of any individual appearing in uploaded content and had no mechanism whatsoever

to confirm that the person appearing in a video or photograph was the same person who uploaded it or who purported to "verify" it.

46. Defendants permit and, upon information and belief, permitted at all times relevant hereto, users to download content from their websites, private-message one another, and create private folders to share content — features that, upon information and belief, facilitate the recirculation of content after it has been reported and disabled, including the content depicting Plaintiff described below.

47. Upon information and belief, at all times relevant hereto, Defendants purported to have moderators review content before it was made public, but in fact relied on a small number of low-level contractors whose principal function was to optimize content for search-engine traffic rather than to verify consent or age.

c. **<u>Financial Institutions Cut Ties, and Defendants' Own Statements Confirm Their Motive</u>**

48. Following a December 2020 New York Times investigation documenting the prevalence of child sexual abuse material on Pornhub, Mastercard, Visa, and Discover each announced that they would cease processing payments in connection with Pornhub, with Mastercard stating that its investigation had "confirmed violations of our standards prohibiting unlawful content."

49. Within days, Defendants removed approximately ten million videos from Pornhub — nearly two-thirds of the content then hosted on the site — restricting the platform, going forward, to content uploaded by "verified" users. Upon information and belief, Defendants did not, at that time or since, confirm that the individuals appearing in the videos that remained were consenting adults.

50. As Pornhub's own former Senior Community Manager acknowledged in a public forum post, meaningful age verification would be a "disaster" for Pornhub because it "costs us money to verify" and would result in a substantial reduction in traffic — confirming that Defendants' verification failures were, and are, a matter of business choice rather than technical limitation.

d. **<u>Defendants' Reupload and "Whack-a-Mole" Practice</u>**

51. Upon information and belief, Defendants did not, and to this day do not, permanently delete content reported as unlawful or non-consensual. Instead, upon information and belief, Defendants merely disable public access to a reported URL while retaining the underlying file on their servers and/or on the servers of affiliated entities, enabling the same file to be

reuploaded — by the same or a different user, under a new title, to the same site or to an affiliated site such as PornMD.com or RedTube — after a report has been resolved.

52. Defendants have represented publicly that they use "fingerprinting" technology, including hash-matching tools such as PhotoDNA, to prevent the reupload of previously removed content. Upon information and belief, this technology, as implemented by Defendants, has proven ineffective at preventing the repeated reappearance of content depicting Plaintiff, described in detail below, despite Defendants' representations to Plaintiff's counsel that specific videos had been removed and "fingerprinted."

e. **The 2025 FTC and Utah Enforcement Action Confirms Defendants' Knowing Misconduct**

53. On or about September 3, 2025, the Federal Trade Commission and the Utah Division of Consumer Protection filed a joint enforcement action, FTC & Utah v. Aylo Group Ltd., et al., No. 2:25-cv-00752 (D. Utah), against Aylo Group Ltd. and numerous affiliated entities — the rebranded successors to the MindGeek enterprise — alleging unconscionable and deceptive practices in connection with, among other things, Defendants' historic failure to prevent the posting and continued availability of child sexual abuse material and non-consensual content on their platforms.

54. That action resulted in a stipulated order, entered on or about September 8-9, 2025, requiring the Aylo defendants to pay $5,000,000 immediately (with an additional $10,000,000 suspended judgment), to implement a program to prevent child sexual abuse material and non-consensual material from being uploaded, to implement meaningful age and consent verification, to remove legacy content that cannot be verified as depicting only consenting adults, and to submit to biennial independent audits for ten years.

55. Upon information and belief, the conduct that gave rise to the FTC and Utah enforcement action is the same conduct — the knowing failure to verify age and consent and the knowing failure to permanently remove reported non-consensual and underage content — that caused and continues to cause the harm to Plaintiff alleged herein.

f. **Plaintiff K.F.'s Experience**

56. Plaintiff was, at all relevant times, in an intimate relationship with Nigel Theron Joseph. During the course of that relationship, Mr. Joseph recorded and/or obtained private, intimate videos

depicting Plaintiff engaging in sexual acts, at a time when Plaintiff was sixteen and seventeen years old.

57. After the relationship ended, Plaintiff learned from a mutual friend and from social media platforms — including Instagram, Facebook, and Twitter — that Mr. Joseph had posted and/or shared these private videos online, without Plaintiff's knowledge or consent, on websites operated by Defendants, including Pornhub.com and RedTube.com, beginning in or around December 2020 and continuing thereafter.

58. Upon information and belief, at least one of the video's depicting Plaintiff was posted with crude, disparaging, and racially demeaning commentary directed at Plaintiff.

59. Defendants did not merely host this content passively. Upon information and belief, Defendants' systems propagated at least one of the videos depicting Plaintiff from Pornhub to RedTube and to PornMD.com and featured that video on Pornhub's front page — a curatorial placement reserved for content Defendants determine will drive traffic — resulting in the video being viewed tens of thousands of times and displayed alongside paid TrafficJunky advertising from which Defendants profited directly.

60. The videos remained accessible on Pornhub for approximately one month before Plaintiff became aware of their existence.

**Table A: Plaintiff's Counsel's Takedown Correspondence with Pornhub (December 2020)**

61. Upon learning of the videos, Plaintiff, through her counsel, Tyrone A. Blackburn, Esq., immediately began sending written takedown demands to Pornhub, beginning December 7, 2020. The correspondence between Mr. Blackburn and Pornhub's support staff — attached hereto as **Exhibit A** and incorporated by reference — establishes that Defendants had actual, written notice that the content depicted Plaintiff without her consent, and, upon information and belief, actual or constructive notice of Plaintiff's minority at the time the underlying recordings were made, no later than December 2020:

    a. December 7, 2020, 10:04 p.m. and 11:44 a.m.: Pornhub Support issues automated acknowledgments of Mr. Blackburn's takedown reports (Reference Nos. 2081338 and 2080179, respectively).
    b. December 7, 2020, 10:16 p.m.: Pornhub Support representative "Janie" confirms that a reported video has been removed, the associated account banned, and the content "fingerprinted" using Vobile technology to prevent reupload.
    c. December 8, 2020, 9:30 a.m.: Pornhub Support representative "Kevin" confirms that a video has been removed, fingerprinted, and the associated account deleted.

d. December 8, 2020, 1:44 p.m.: Pornhub Support representative "Taylor Lynn" confirms removal of an additional reported link (Reference No. 2080177).
e. December 8, 2020, 1:56 p.m.: Mr. Blackburn advises Pornhub Support, in writing, that two additional URLs depicting Plaintiff remain live on Pornhub, and that four additional preview videos depicting Plaintiff remain live on the affiliated site PornMD.com under the titles "(REDACTED) (REDACTED) (REDACTED) Having fun doggystyle," "(REDACTED) Freak," "Sex in public bathroom," and "Fucking my thot in the public bathroom."
f. December 8, 2020, 1:57 p.m.: Pornhub Support representative "Kevin" responds that Pornhub is unable to remove content hosted on PornMD.com — despite PornMD.com being, upon information and belief, an affiliated MindGeek-controlled property that receives content and traffic directly from Pornhub's ecosystem.
g. December 9, 2020, 8:38 a.m.: Mr. Blackburn advises Pornhub Support, in writing, that yet another video depicting Plaintiff, titled "(REDACTED)(REDACTED) Wife," remains live.
h. December 9, 2020, 10:04 p.m.: Pornhub Support representative "Jane" confirms removal of three additional reported URLs and refers Mr. Blackburn to PornMD.com's separate contact channel for the content Pornhub claims it cannot control.
i. December 9, 2020, 10:15 p.m.: Mr. Blackburn advises Pornhub Support, in writing, of yet another video depicting Plaintiff, titled "Me fucking (REDACTED) (REDACTED) gf," distributed through Defendants' ModelHub platform.

62. As the foregoing correspondence establishes, for every video Defendants confirmed as "removed" and "fingerprinted," at least one additional video or preview depicting Plaintiff remained live or reappeared on a Defendant-affiliated platform, requiring Plaintiff's counsel to send successive, individualized demands over a period of days. Upon information and belief, this pattern reflects the same reupload and fingerprint-evasion practice described in related federal litigation against these same Defendants, in which a former MindGeek employee testified that previously removed content was provided to employees on physical media with instructions to reupload the content from non-MindGeek computers and email addresses specifically so as to bypass Defendants' "fingerprinting" system.

63. Upon information and belief, despite Defendants' repeated representations to Plaintiff's counsel in December 2020 that specific videos had been permanently removed and fingerprinted, videos and images depicting Plaintiff have continued to reappear on Defendants' platforms and Defendant-affiliated platforms in the years since, including, upon information and belief, a video currently accessible at redwap.tv/xvideos/video-59774653/(REDACTED)-(REDACTED)-(REDACTED)-wife as of the filing of this Complaint.

64. Upon information and belief, and further confirming that Defendants' removals have never been permanent, a separate and distinct video depicting Plaintiff, uploaded by a Pornhub

account identified as "Enterthezone," remains accessible on Pornhub.com as of the filing of this Complaint and has accumulated at least 153,149 views, a metric reflecting Defendants' own platform-generated view counter and demonstrating that the content at issue continues to be viewed by tens of thousands of members of the public years after Plaintiff's counsel's initial written notice.

65. Plaintiff was 16 or 17 years old in the video:



66. Defendants financially benefited, and continue to benefit, from the unauthorized display of Plaintiff's image through increased traffic, advertising revenue, and subscription revenue. Plaintiff has never received, and did not seek, any compensation for Defendants' commercial use of her image, likeness, and sexual acts.

g. **Plaintiff's Damages**

67. As a direct and proximate result of Defendants' conduct, Plaintiff has suffered, and continues to suffer, severe and lasting psychological injury. As early as June 2022, Plaintiff had already sought counseling from Melissa Schwartz, LCSW, LMFT, of The Center for Individual and Relational Development (**Exhibit B**), attending five individual sessions and three joint sessions with her minor son to address the abuse she experienced in her relationship with Mr. Joseph, at a cost of $960.00, with the provider recommending five to eight additional sessions of individual or family therapy.

68. Plaintiff was evaluated again on December 11, 2023, by Belinda Narine, DNP-c, PMHNP-BC, ANP-BC, who diagnosed Plaintiff with Adjustment Disorder with anxiety and depressed mood (in partial remission) and Post-Traumatic Stress Disorder (active), both attributable to Plaintiff's relationship with Mr. Joseph and the subsequent non-consensual dissemination of the videos at issue. Plaintiff's evaluation reflected a PHQ-9 depression score of 8 and a GAD-7 anxiety score of 9, and the evaluator recommended psychotherapy, including cognitive behavioral therapy and EMDR, three times weekly for a minimum of 120 months.

69. Plaintiff previously served as a law enforcement officer before the events giving rise to this action, and both of her parents are retired law enforcement officers. Since the non-consensual dissemination of the videos at issue, Plaintiff has applied for at least six subsequent law enforcement and public-safety positions, and each of those applications has been rejected after a background check surfaced the very videos Defendants promised, and failed, to permanently remove.

70. By way of example, on August 2, 2024, a Florida law enforcement agency ("Agency 1") rescinded Plaintiff's conditional offer of employment for the position of Police Officer, notifying her in a written letter, signed by its Chief of Police, that her conditional offer of employment was being rescinded due to her "unsuccessful completion of the conditional offer process" (**Exhibit C**).

71. On November 18, 2024, a second Florida law enforcement agency ("Agency 2") likewise declined to hire Plaintiff for a certified Police Officer position after advancing her through the same conditional hiring process (**Exhibit D**); upon information and belief, and as Agency 2's human resources department subsequently confirmed to Plaintiff by telephone, Plaintiff was not selected because her background check surfaced the same non-consensually disseminated videos at issue in this action.

72. Plaintiff's evaluation documented severe anxiety specifically associated with the ongoing risk that any future background check will reveal the content at issue, given Defendants' failure to permanently remove it.

73. Plaintiff's minor son, who was approximately fourteen years old at the time of Plaintiff's psychological evaluation, has been bullied at school because of the continued availability of the content depicting Plaintiff, resulting in at least one physical altercation and a school suspension.

74. Plaintiff has incurred, and will continue to incur, costs for psychological treatment, attorney's fees and costs associated with attempting to secure removal of the content at issue, and lost income and lost career opportunities, in an amount to be proven at trial.

75. In addition to the career and psychological harm described above, Plaintiff has been directly targeted by members of the public who accessed and viewed the non-consensually disseminated videos at issue on Defendants' platforms, as documented in a compilation of unsolicited social-media messages and comments received by Plaintiff (**Exhibit E**).

76. By way of example, in 2024, an Instagram user identifying himself as "Pwhitney" (handle: pwhitney49) sent Plaintiff a series of unsolicited, sexually explicit, and racially degrading messages referencing the videos, including, verbatim:

   a. "Hi. I love to see u taking cock. I watched both videos all the time. Thanks";
   b. "Vaginas are ugly and they stink... don't know why women walk around like they are something special. Women r inferior u bitches!! And u know that. Nasty bitches. Plus, black women more than any other race carry's lots of vaginal diseases. Black women stinks plus the attitude to go with it. That's why nobody likes u u fucking Niggers!!" (followed by laughing-face emojis and the word "monkeys");
   c. "Smelly vags";
   d. "Whore!!!"; and
   e. "Hoe!!!"

77. Plaintiff never solicited, accepted, or responded to these messages, which arrived unsolicited as Instagram "message requests" from an account with no prior relationship to Plaintiff. Upon

information and belief, this harassment is a direct and foreseeable consequence of Defendants' continued hosting, distribution, and monetization of the videos depicting Plaintiff, which has exposed Plaintiff to ongoing, unsolicited, sexually explicit, and racially abusive contact from members of the public who viewed the content on Defendants' platforms.

78. The Pwhitney messages were not an isolated incident. Plaintiff's counsel has compiled a broader record of unsolicited third-party contact from members of the public who recognized Plaintiff from the videos at issue (**Exhibit E**), including, by way of further example:

   a. an Instagram user (handle: kghmelly) who messaged Plaintiff, verbatim, “Pornstar…cum suck me off next”;
   b. an Instagram user (handle: jtgazadan.vu) who sent Plaintiff a series of sexually explicit and demeaning messages referencing Plaintiff's reputation and character;
   c. at least three separate Instagram users (handles: cc__26, soca_yardie, and shariabeatyuhbad) who each messaged Plaintiff directly, unprompted, stating that they recognized Plaintiff by face from one of the videos depicting her, confirming that the content had circulated widely enough for strangers to identify Plaintiff on sight;
   d. and a public Instagram comment, visible to Plaintiff's followers and to members of the public, from a user (handle: appiah.__) stating that content depicting Plaintiff was “already on all porn sites” and invoking Plaintiff's minor son in a manner intended to maximize Plaintiff's humiliation and distress.

79. Each of these unsolicited contacts arrived from accounts with no prior relationship to Plaintiff and expressly referenced content that originated on, or was propagated by, Defendants' platforms, confirming that the harm alleged herein is neither speculative nor confined to Defendants' own platforms, but has metastasized into ongoing, foreseeable, real-world harassment of Plaintiff by third parties.

## CLASS ACTION ALLEGATIONS

### a. <u>**The Proposed Classes**</u>

80. Plaintiff brings this action individually and, pursuant to Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, on behalf of the following proposed classes (collectively, the "Classes"):

81. <u>The CSAM Class</u>: All individuals who, while under the age of eighteen, were depicted engaging in sexually explicit conduct in videos or images that were uploaded to, hosted on, distributed through, or monetized by any website owned, operated, or controlled by Defendants at any time during the period beginning January 1, 2011 through the date of class certification (the "CSAM Class"), without regard to any shorter limitations period that might otherwise appear applicable, in light of the absence of any federal statute of limitations for CSAM Class members' claims under 18 U.S.C. § 2255, as amended, and New York's extended limitations

periods under CPLR §§ 208(b) and 212(e), each as more fully alleged in the Class Action Allegations below.

82. The Non-Consensual Content Removal Class: All individuals whose non-consensual sexually explicit images or videos were uploaded to, hosted on, or distributed through any website owned, operated, or controlled by Defendants, and who, or whose counsel, provided Defendants with actual written notice that such content was posted without the depicted individual's consent, where Defendants failed to permanently remove such content, resulting in the content's reappearance on any Defendant-owned, Defendant-controlled, or Defendant-affiliated website at any time during the period beginning three years before the filing of this Complaint through the date of class certification (the "Removal Failure Class").

83. Excluded from the Classes are Defendants; any parent, subsidiary, or affiliate of Defendants, or any entity in which Defendants have a controlling interest; the officers, directors, and employees of Defendants; and the judicial officer(s) to whom this action is assigned, together with their immediate family members and staff.

84. Plaintiff is a member of the CSAM Class because, as alleged above, she was sixteen and seventeen years old when the videos depicting her were created, and those videos were subsequently uploaded to, hosted on, and monetized by Defendants' websites.

85. Plaintiff is a member of the Removal Failure Class because, as alleged above, her counsel provided Defendants with actual written notice, beginning December 7, 2020, that content depicting her was posted without her consent, and Defendants failed to permanently remove that content, which has repeatedly reappeared on Defendants' platforms and affiliated platforms, including as recently as the filing of this Complaint.

b. **Numerosity — Fed. R. Civ. P. 23(a)(1)**

86. Rule 23(a)(1) requires that "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1).

87. Upon information and belief, the members of the CSAM Class and the Removal Failure Class are each so numerous that joinder of all members is impracticable.

88. Defendants' own internal "TOS8 Audit" records, produced in related federal litigation against these same Defendants, document that Defendants identified at least 38,132 videos and images constituting child sexual abuse material on their platforms as of April 2023 alone, which had amassed over 713 million views during the relevant period — establishing that the CSAM

Class numbers, at minimum, in the tens of thousands. See Jane Doe v. MindGeek USA Inc., No. 8:21-cv-00338-WLH-ADS (C.D. Cal.).

89. Upon information and belief, because Defendants' "whack-a-mole" practice of disabling access to reported content without permanently deleting the underlying files, as alleged above, is a company-wide practice applied uniformly to all reported non-consensual content — not a practice unique to Plaintiff — the Removal Failure Class likewise numbers at least in the hundreds, and, upon information and belief, in the thousands, based on the volume of takedown notices that Defendants' own support systems are designed and staffed to process.

90. The precise number and identities of Class members are presently known to Defendants and are readily ascertainable from Defendants' own business records, including the TOS8 Audit, user-upload logs, content-fingerprinting logs, and takedown-request logs, which are within Defendants' exclusive possession, custody, and control.

c. **Commonality — Fed. R. Civ. P. 23(a)(2)**

91. Rule 23(a)(2) requires that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2).

92. Common questions of law and fact exist as to the CSAM Class, including, without limitation: (a) whether Defendants received, distributed, or possessed child sexual abuse material; (b) whether Defendants knew or recklessly disregarded a high probability that their platforms hosted child sexual abuse material; (c) whether Defendants took deliberate actions to avoid confirming the age or consent of individuals depicted in uploaded content; (d) whether Defendants knowingly benefited from a venture engaged in sex trafficking; (e) whether Defendants' upload and "verification" processes were legally sufficient to satisfy Defendants' duties under 18 U.S.C. §§ 1591, 2252, and 2252A; and (f) whether Defendants' conduct entitles CSAM Class members to liquidated damages under 18 U.S.C. § 2255.

93. Common questions of law and fact exist as to the Removal Failure Class, including, without limitation: (a) whether Defendants maintained, and maintain, a uniform company-wide policy or practice of disabling, rather than permanently deleting, reported non-consensual content; (b) whether that policy or practice foreseeably and knowingly permits reported content to reappear on Defendants' platforms and affiliated platforms; (c) whether Defendants' "fingerprinting" technology was, and is, adequate to prevent such reappearance; and (d) whether Defendants' common course of conduct violates N.Y. Civil Rights Law §§ 50, 51, and 52-b.

d. **Typicality — Fed. R. Civ. P. 23(a)(3)**

94. Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). Typicality is satisfied where (1) other class members have the same or similar injury, (2) the challenged conduct is not unique to the named plaintiff, and (3) other class members were injured by the same course of conduct.

95. Plaintiff's claims are typical of the claims of the Classes because, like other Class members, Plaintiff (a) had non-consensual sexual content depicting her posted on Defendants' platforms without her knowledge or consent, at a time when she was a minor; (b) provided Defendants with actual written notice of the non-consensual and underage nature of that content; and (c) suffered injury as a direct result of Defendants' common course of conduct — namely, Defendants' business model and content-moderation practices — which are not unique to Plaintiff but are applied uniformly to all individuals depicted in reported content on Defendants' platforms.

e. **Adequacy of Representation — Fed. R. Civ. P. 23(a)(4)**

96. Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4).

97. Plaintiff will fairly and adequately protect the interests of the Classes. Plaintiff has no interests antagonistic to, or in conflict with, the interests of other Class members, and Plaintiff's interest in obtaining permanent removal of unlawful content and full compensation for the harm caused by Defendants' common course of conduct is fully aligned with the interests of the Classes as a whole.

98. Plaintiff has retained counsel experienced in complex civil litigation, including sex trafficking, child exploitation, and mass-tort litigation against Defendants and their corporate predecessors, who will vigorously and competently prosecute this action on behalf of the Classes.

f. **Rule 23(b)(3) — Predominance and Superiority (CSAM Class)**

99. Rule 23(b)(3) requires that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

100. Common questions of law and fact predominate over any questions affecting only individual CSAM Class members. Liability turns on Defendants' company-wide conduct —

including Defendants' uniform failure to implement meaningful age- and consent-verification measures, Defendants' internal knowledge (documented in the TOS8 Audit) that specific reported content constituted child sexual abuse material, and Defendants' uniform "whack-a-mole" practice of disabling rather than permanently deleting reported content — common evidence that will predominate at trial over any individualized issues, such as the calculation of each Class member's damages.

101. A class action is superior to other available methods for the fair and efficient adjudication of this controversy because, among other things: (a) individual Class members, many of whom were minors at the time the underlying content was created, may be reluctant or unable to pursue individual claims given the sensitive and traumatic nature of the subject matter; (b) the expense and burden of individual litigation would make it economically infeasible for many Class members to pursue relief individually; and (c) resolution of the common questions of Defendants' liability in a single proceeding will conserve judicial resources and promote consistency of adjudication.

g. **Rule 23(b)(2) — Injunctive Relief Class (Both Classes)**

102. Rule 23(b)(2) applies where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2).

103. Defendants have acted, and refused to act, on grounds generally applicable to the Classes as a whole by maintaining a uniform, company-wide practice of disabling — rather than permanently deleting — reported non-consensual and underage sexual content, thereby making appropriate final injunctive and declaratory relief requiring the permanent removal of all such content across Defendants' platforms and affiliated platforms, and enjoining its future posting, distribution, and monetization, as set forth in the Prayer for Relief below.

h. **New York State Class Allegations — C.P.L.R. Article 9**

104. In addition to, and not in lieu of, the Rule 23 class allegations set forth above, Plaintiff brings this action on behalf of the same Classes defined above pursuant to N.Y. C.P.L.R. §§ 901-909, New York's class action statute, to the extent New York substantive law governs any Class member's claim, including the claims asserted herein under N.Y. Civil Rights Law §§ 50, 51, and 52-b and N.Y. General Business Law § 349.

105. The requirements of C.P.L.R. § 901(a) — numerosity, commonality, typicality, and adequacy of representation — are satisfied for the same reasons set forth above with respect to Rule 23(a), which this paragraph incorporates by reference.

106. C.P.L.R. § 901(b) provides that a class action to recover a penalty, or minimum measure of recovery created or imposed by statute, may not be maintained unless the statute creating the penalty specifically authorizes recovery in a class action.

107. This action, however, is pending in, and will proceed in, federal court, where Federal Rule of Civil Procedure 23 — not C.P.L.R. § 901(b) — governs the availability of class-action treatment.

108. A Federal Rule of Civil Procedure that answers the same question as a conflicting state law controls in federal court under the Rules Enabling Act, regardless of whether the state law is classified as procedural or substantive, provided the Federal Rule does not abridge, enlarge, or modify a substantive right. Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co., 559 U.S. 393, 398-410 (2010) (plurality op.); id. at 416-33 (Stevens, J., concurring in part and concurring in the judgment) (Rule 23 authorizes a federal class action for statutory penalties notwithstanding C.P.L.R. § 901(b)); see also Berk v. Choy, 607 U.S. 187 (2026) (reaffirming that a state rule which "demand[s] more" of a litigant than the corresponding Federal Rule of Civil Procedure does not apply in federal court).

109. Accordingly, Plaintiff's and the Classes' claims for statutory and exemplary damages under N.Y. Civil Rights Law § 51 and for treble damages under N.Y. General Business Law § 349(h) are properly asserted on a class-wide basis in this action notwithstanding C.P.L.R. § 901(b).

110. New York's statutes of limitations and tolling provisions, rather than any comparable but shorter period that might otherwise apply, govern the timeliness of the New York state-law claims asserted herein, and permit the Classes to recover for conduct extending further back in time than the CSAM Class definition's stated start date.

111. C.P.L.R. § 208(b), as amended by the Child Victims Act, permanently extends the limitations period — without any age cap on Plaintiff's or a Class member's age at the time of the offense, and until the plaintiff reaches fifty-five years of age — for civil claims arising from conduct that would constitute a sexual offense under Penal Law Article 130, or the use of a person in a sexual performance under Penal Law § 263.05, committed against a person who was under eighteen years of age at the time of the conduct; because the videos and images

at issue depict Plaintiff's use in a sexual performance while she was under eighteen, her N.Y. Civil Rights Law claims premised on that conduct are timely regardless of her age at filing.

112. C.P.L.R. § 212(e) separately provides a fifteen-year limitations period, running from the date of victimization (or, for a minor victim, from the date the victim reaches the age of majority), and tolled during any period the victim remains subject to the trafficking conduct, for civil claims brought pursuant to N.Y. Social Services Law § 483-bb(c) arising from sex trafficking or compelling prostitution — a period substantially longer than the corresponding three-year period that would otherwise apply to many New York statutory tort claims.

113. The federal statutes of limitations governing Plaintiff's and the Classes' federal claims likewise permit recovery for conduct extending well beyond the CSAM Class definition's stated start date.

114. 18 U.S.C. § 1595(c) allows a civil action under the Trafficking Victims Protection Reauthorization Act to be commenced no later than the later of ten years after the cause of action arose or ten years after a victim reaches eighteen years of age.

115. More significantly, 18 U.S.C. § 2255, as amended by the Eliminating Limits to Justice for Child Sex Abuse Victims Act of 2022, Pub. L. No. 117-176, 136 Stat. 2108, eliminated any statute of limitations for a civil action brought under Section 2255 by a person who was a minor at the time of the conduct giving rise to the claim, for claims not already time-barred as of the Act's September 16, 2022, effective date.

116. Because Plaintiff's and the CSAM Class's claims under 18 U.S.C. §§ 2252 and 2252A (Counts IV and V) were not time-barred as of that date — the conduct at issue began in December 2020 and, upon information and belief, has continued and recurred through the present — those claims are subject to no federal limitations period whatsoever.

117. Further, upon information and belief, each instance in which content depicting a CSAM Class member or Removal Failure Class member is reuploaded to Defendants' platforms or affiliated platforms constitutes a new and independently actionable violation, giving rise to a fresh limitations period as to that reupload, because the reupload republishes the content, under a new URL and to a new audience, independent of any prior notice, takedown, or limitations period applicable to an earlier posting of the same content. See Elden v. Nirvana L.L.C., 88 F.4th 1292, 1300-04 (9th Cir. 2023) (each republication of an image may constitute a new, independently actionable injury for statute-of-limitations purposes).

118. Accordingly, and in light of the foregoing, Plaintiff submits that the CSAM Class period defined above, beginning January 1, 2011, is a conservative and manageable temporal boundary that does not exceed what New York's and the federal government's extended and, as to Counts IV and V, eliminated limitations periods would otherwise permit.

119. A class action is a superior method for the fair and efficient adjudication of the New York state-law claims for the same reasons set forth above with respect to Rule 23(b)(3), which this paragraph incorporates by reference, including that class treatment avoids requiring survivors of child sexual exploitation and non-consensual intimate-image dissemination to relitigate the same core facts — Defendants' company-wide verification, moderation, and reupload practices — in a multiplicity of individual actions, each of which would separately require survivors to relive and publicly recount deeply personal and traumatic events. See Doe 1 v. JPMorgan Chase Bank, N.A., No. 22-cv-10019, 2023 WL 3945773, at *8-9 (S.D.N.Y. June 12, 2023) (class treatment of sex-trafficking-related claims is superior in part because it avoids re-traumatizing survivors through repetitive individual litigation of the same underlying conduct).

## CAUSES OF ACTION

### COUNT I

Sex Trafficking — Direct Perpetrator Liability
(18 U.S.C. §§ 1591(a)(1), 1595)
(Against the MindGeek Defendants)

120. Plaintiff incorporates by reference each allegation set forth above as though fully set forth herein.

121. The MindGeek Defendants, through their platforms, knowingly recruited, enticed, harbored, transported, provided, obtained, advertised, maintained, patronized, and/or solicited Plaintiff — whom they knew or recklessly disregarded had not attained the age of eighteen at the time the commercial sex act depicted in the videos at issue was recorded, in and around December 2020 and before — and/or caused Plaintiff to be the subject of a commercial sex act through their own affirmative post-upload conduct, in violation of 18 U.S.C. § 1591(a)(1). Upon information and belief, the "commercial sex act" element is independently satisfied by Defendants' own post-upload conduct because Defendants derived a thing of value — specifically, per-view advertising revenue generated through Defendants' TrafficJunky advertising network and directly attributable to the video depicting Plaintiff — in exchange for

making that content available to viewers, such that Defendants themselves, and not merely a third party, gave and received a thing of value on account of the sex act depicted. This includes by:

a. maintaining, at the time the content depicting Plaintiff first appeared on Defendants' platforms in December 2020, an upload and "Model Program"/"ModelHub" verification process that required only a photograph of a person holding handwritten paper bearing a username and the word "pornhub.com," with no government-issued identification, no birthdate, and no independent confirmation of age, such that Defendants obtained and maintained content depicting Plaintiff with no means of ascertaining that she was, in fact, a minor;

b. featuring the video depicting Plaintiff on Pornhub's front page — a curatorial and editorial placement Defendants reserve for content selected to drive traffic — resulting in tens of thousands of views and the display of paid TrafficJunky advertising alongside the video, thereby advertising Plaintiff, within the meaning of Section 1591(a)(1), for the commercial purpose of generating advertising revenue;

c. propagating the video depicting Plaintiff from Pornhub to the affiliated platforms RedTube and PornMD.com, and, upon information and belief, distributing at least four additional preview clips depicting Plaintiff to PornMD.com under the titles "(REDACTED) (REDACTED) (REDACTED) Having fun doggystyle," "(REDACTED) Freak," "Sex in public bathroom," and "Fucking my thot in the public bathroom," as documented in Plaintiff's counsel's December 8, 2020, written correspondence with Pornhub Support;

d. continuing to maintain, patronize, and solicit continued traffic to content depicting Plaintiff after December 7, 2020 — the date Defendants received Plaintiff's counsel's first written takedown demands (Pornhub Reference Nos. 2081338 and 2080179) — and after each of the at least seven subsequent written notices identified in Table A above specifying additional URLs, titles, and platforms on which content depicting Plaintiff remained live; and

e. upon information and belief, failing to permanently delete the underlying digital files after Pornhub Support representatives "Janie," "Kevin," "Taylor Lynn," and "Jane" each separately represented in writing, between December 7 and December 9, 2020,

that specific videos depicting Plaintiff had been removed and "fingerprinted" using Vobile technology, thereby maintaining and re-obtaining the content when it was, upon information and belief, deliberately reuploaded from computers and email addresses not associated with Defendants for the specific purpose of evading that fingerprinting system — consistent with the practice a former MindGeek employee has testified to in related federal litigation against these same Defendants — and as most recently reflected in the reupload presently accessible at redwap.tv/xvideos/video-59774653/(REDACTED)-(REDACTED)-(REDACTED)-wife.

122. As a direct and proximate result of the MindGeek Defendants' violations of 18 U.S.C. § 1591(a)(1), Plaintiff has suffered substantial physical, psychological, financial, and reputational harm — including the Post-Traumatic Stress Disorder and Adjustment Disorder diagnosed by Belinda Narine, DNP-c, PMHNP-BC, ANP-BC, on December 11, 2023, and the loss of the conditional law enforcement job offers rescinded on August 2, 2024 and November 18, 2024 after background checks surfaced the content at issue — entitling her to compensatory damages, punitive damages, and reasonable attorneys' fees and costs pursuant to 18 U.S.C. § 1595.

123. This claim is pled in the alternative to Count II below to the extent this Count is found not to lie. Plaintiff notes that in related litigation against the MindGeek Defendants arising from materially similar conduct, a direct liability claim under 18 U.S.C. § 1591(a)(1) was dismissed at the pleading stage for insufficient allegations that the defendant itself, rather than third-party uploaders, recruited or caused the plaintiff to engage in a commercial sex act. See Fleites v. MindGeek S.a.r.l., No. 2:21-cv-04920-WLH-ADS (C.D. Cal. Sept. 26, 2025). Unlike that case, Plaintiff alleges specific facts, set forth above, that the MindGeek Defendants' own affirmative conduct — including featuring the content depicting Plaintiff on Pornhub's front page, maintaining a verification process that solicited no proof of age or consent, and facilitating repeated reuploads after actual notice — caused Plaintiff to remain the subject of a commercial sex act within the meaning of 18 U.S.C. § 1591(a)(1).

**COUNT II**

Sex Trafficking — Knowing Benefit from a Trafficking Venture
(18 U.S.C. §§ 1591(a)(2), 1595)
(Against the MindGeek Defendants)

124. Plaintiff incorporates by reference each allegation set forth above as though fully set forth herein.

125. The MindGeek Defendants knowingly benefited financially, and received things of value, from participation in a venture — the operation of Pornhub, RedTube, and PornMD.com as an integrated, commonly controlled advertising and subscription business — that recruited, enticed, harbored, transported, provided, obtained, advertised, maintained, patronized, and/or solicited Plaintiff, whom they knew or recklessly disregarded had not attained the age of eighteen at the time of the commercial sex act depicted, in violation of 18 U.S.C. § 1591(a)(2), including by:

a. deriving advertising revenue, through TrafficJunky and otherwise, from the tens of thousands of views generated by the front-page placement of content depicting Plaintiff;

b. deriving subscription and premium-service revenue from a platform whose traffic depended in material part on unverified user-uploaded content of the kind Pornhub's own former Senior Community Manager publicly acknowledged would be reduced by meaningful age verification, which that employee described in a public forum post as a "disaster" that "costs us money";

c. upon information and belief, maintaining the underlying webpage, thumbnail, and search-index data for each URL depicting Plaintiff reported between December 7 and December 9, 2020, notwithstanding Defendants' written representations that those specific URLs had been removed and the associated accounts banned or deleted;

d. upon information and belief, permitting the reupload of that same previously reported content — including content depicting Plaintiff — to Defendants' own and affiliated platforms after December 2020, and as recently as the reupload currently accessible at redwap.tv/xvideos/video-59774653/(REDACTED)-(REDACTED)-(REDACTED)-wife; and

e. upon information and belief, structuring Defendants' relationship with PornMD.com so that, as Pornhub Support representative "Kevin" stated in writing on December 8, 2020,

Pornhub disclaimed any ability to remove content its own ecosystem had propagated to that affiliate, while TrafficJunky, Defendants' own advertising subsidiary, continued to monetize the resulting traffic.

126. The MindGeek Defendants knew, or recklessly disregarded the fact, that they were benefiting from a venture engaged in sex trafficking within the meaning of 18 U.S.C. § 1591, because, among other things:

(a) they had actual written notice, through no fewer than nine separate written communications between Plaintiff's counsel and Pornhub Support between December 7 and December 9, 2020 (Table A above), that specific, identified content depicted Plaintiff without her consent;

(b) upon information and belief, they had actual or constructive notice that Plaintiff was a minor at the time the underlying recordings were made, given that the videos were transmitted to Defendants' platforms as private, intimate content never authorized for public distribution;

(c) they possessed, and upon information and belief continued to possess, the underlying files after representing in writing that they had been removed and fingerprinted; and

(d) Defendants' own internal "TOS8 Audit," produced in related federal litigation against these same Defendants, documents that Defendants identified at least 38,132 videos and images constituting child sexual abuse material on their platforms as of April 2023 — evidencing that the pattern of undetected and inadequately removed underage content to which Plaintiff was subjected was neither isolated nor unknown to Defendants. See Jane Doe v. MindGeek USA Inc., No. 8:21-cv-00338-WLH-ADS (C.D. Cal.).

127. As a direct and proximate result of the MindGeek Defendants' violations of 18 U.S.C. § 1591(a)(2), Plaintiff has suffered substantial physical, psychological, financial, and reputational harm — including the harm described in Paragraph 96 above — entitling her to compensatory damages, punitive damages, and reasonable attorneys' fees and costs pursuant to 18 U.S.C. § 1595.

**COUNT III**
Conspiracy to Violate the Trafficking Victims Protection Act
(18 U.S.C. §§ 1594(c), 1595)
(Against the MindGeek Defendants)

128. Plaintiff incorporates by reference each allegation set forth above as though fully set forth herein.

129. Upon information and belief, the MindGeek Defendants — including defendant Bergmair, as the enterprise's beneficial owner with ultimate authority over resource allocation and business-model decisions; defendant Antoon, as Chief Executive Officer with direct authority over content-moderation practices; defendant Tassillo, as Chief Operating Officer with direct operational authority over the trust-and-safety and takedown-response functions that processed the Table A correspondence described above; and defendant Urman, as Vice President of Product Management for the Video Sharing Platform with direct responsibility for the design of the upload, verification, and inter-platform propagation systems described above — agreed among themselves, and with the operators of affiliated sites such as PornMD.com, to maintain a business model and content-moderation practice that each knew would result in the continued availability of unverified, non-consensual, and underage sexual content, including content depicting Plaintiff, in order to maximize the advertising and subscription revenue described above.

130. In furtherance of that agreement, the MindGeek Defendants committed overt acts, including: designing and maintaining, through defendant Urman, an upload and "verification" process without meaningful age or consent verification; directing and ratifying, through defendants Antoon and Tassillo, a takedown-response practice under which Pornhub Support representatives disclaimed responsibility, in writing, for content propagated to affiliated platforms such as PornMD.com; and, upon information and belief, permitting the reupload of previously reported content depicting Plaintiff — including the content currently accessible at redwap.tv/xvideos/video-59774653/(REDACTED)-(REDACTED)-(REDACTED)-wife — notwithstanding Defendants' written December 2020 representations that such content had been removed and fingerprinted, all with the knowledge and, upon information and belief, at the direction or ratification of defendant Bergmair as the enterprise's controlling beneficial owner.

131. As a direct and proximate result of this conspiracy, Plaintiff has suffered substantial physical, psychological, financial, and reputational harm, entitling her to compensatory damages, punitive damages, and reasonable attorneys' fees and costs pursuant to 18 U.S.C. § 1595.

**COUNT IV**

Receipt, Transportation, Distribution, and Possession of Visual Depictions of a Minor Engaged in Sexually Explicit Conduct
(18 U.S.C. §§ 2252, 2255)
(Against the MindGeek Defendants)

132. Plaintiff incorporates by reference each allegation set forth above as though fully set forth herein.

133. Plaintiff was a victim of violations of 18 U.S.C. § 2252 and suffered personal injury as a result, entitling her to bring this civil action pursuant to 18 U.S.C. § 2255.

134. The MindGeek Defendants knowingly transported visual depictions of a minor engaging in sexually explicit conduct, as defined by 18 U.S.C. § 2256(2)(A) — namely, the videos and images of Plaintiff described above, recorded in and around December 2020 and before, when Plaintiff was sixteen and seventeen years of age — via means affecting interstate and foreign commerce, including by transmitting that content from Defendants' servers, upon information and belief located in part in Waltham, Massachusetts, to users throughout the United States and this District, in violation of 18 U.S.C. § 2252(a)(1).

135. The MindGeek Defendants knowingly received and distributed such visual depictions of Plaintiff via means affecting interstate and foreign commerce, in violation of 18 U.S.C. § 2252(a)(2), including by continuing to distribute and permit access to that content after December 7, 2020 — the date Defendants received Plaintiff's counsel's first written notice identifying the content and Plaintiff's minority — and by distributing, upon information and belief, the reuploaded version of that content currently accessible at redwap.tv/xvideos/video-59774653/(REDACTED)-(REDACTED)-(REDACTED)-wife.

136. The MindGeek Defendants knowingly possessed such visual depictions of Plaintiff with intent to distribute them via means affecting interstate and foreign commerce, in violation of 18 U.S.C. § 2252(a)(3), as demonstrated by, among other things, Defendants' placement of the content on Pornhub's front page and monetization of that placement through paid TrafficJunky advertising.

137. Upon information and belief, even after Pornhub Support representatives "Janie," "Kevin," "Taylor Lynn," and "Jane" each confirmed in writing, between December 7 and December 9, 2020, that specific reported URLs depicting Plaintiff had been disabled, the MindGeek Defendants retained the underlying files on their servers, in violation of 18 U.S.C. § 2252(a)(4), rather than permanently deleting materials they were not legally entitled to possess or redistribute, and, upon information and belief, thereafter permitted or facilitated the reupload of that content — including the version currently accessible at redwap.tv/xvideos/video-59774653/(REDACTED)-(REDACTED)-(REDACTED)-wife — to generate continued traffic and revenue.

138. As a direct and proximate result of the MindGeek Defendants' violations of 18 U.S.C. § 2252, Plaintiff has suffered substantial physical, psychological, financial, and reputational harm — including the harm described in Paragraph 96 above — and the MindGeek Defendants' conduct was knowing, willful, and in reckless disregard of Plaintiff's rights, entitling Plaintiff to injunctive relief, compensatory damages, punitive damages, liquidated damages of not less than $5,000,000, and reasonable attorneys' fees and costs pursuant to 18 U.S.C. § 2255.

**<u>COUNT V</u>**

Receipt, Transportation, Distribution, Reproduction, and
Possession of Child Pornography
(18 U.S.C. §§ 2252A, 2255)
(Against the MindGeek Defendants)

139. Plaintiff incorporates by reference each allegation set forth above as though fully set forth herein.

140. Plaintiff was a victim of violations of 18 U.S.C. § 2252A and suffered personal injury as a result, entitling her to bring this civil action pursuant to 18 U.S.C. § 2255.

141. The MindGeek Defendants knowingly transported child pornography, as defined by 18 U.S.C. § 2256(8) — namely, the videos and images of Plaintiff described above, recorded in and around December 2020 and before, when Plaintiff was sixteen and seventeen years of age — via means affecting interstate and foreign commerce, including by transmitting that content from Defendants' servers, upon information and belief located in part in Waltham, Massachusetts, to users throughout the United States and this District, in violation of 18 U.S.C. § 2252A(a)(1).

142. The MindGeek Defendants knowingly received and distributed such material via means affecting interstate and foreign commerce, including through the ModelHub "verification" process that required only a photograph of a person holding handwritten paper bearing a username and the word "pornhub.com," with no government-issued identification or independent age confirmation, in violation of 18 U.S.C. § 2252A(a)(2).

143. The MindGeek Defendants knowingly reproduced such material for distribution via means affecting interstate and foreign commerce, including by permitting its propagation from Pornhub to affiliated platforms such as RedTube and PornMD.com under preview titles including "(REDACTED) (REDACTED) (REDACTED) Having fun doggystyle," "(REDACTED) Freak," "Sex in public bathroom," and "Fucking my thot in the public bathroom," in violation of 18 U.S.C. § 2252A(a)(3)(A).

144. The MindGeek Defendants knowingly advertised, promoted, presented, and distributed such material — including by featuring it on Pornhub's front page and monetizing it through Defendants' TrafficJunky advertising network — via means affecting interstate and foreign commerce, in violation of 18 U.S.C. § 2252A(a)(3)(B).

145. Upon information and belief, the MindGeek Defendants knowingly possessed such material with intent to distribute it, in violation of 18 U.S.C. § 2252A(a)(4), and knowingly possessed such material after Pornhub Support representatives "Janie," "Kevin," "Taylor Lynn," and "Jane" each confirmed in writing, between December 7 and December 9, 2020, that specific reported URLs depicting Plaintiff had been removed and fingerprinted, in violation of 18 U.S.C. § 2252A(a)(5)(A), rather than permanently deleting materials they were not legally entitled to possess, and, upon information and belief, thereafter permitted or facilitated its reupload — including the version currently accessible at redwap.tv/xvideos/video-59774653/(REDACTED)-(REDACTED)-(REDACTED)-wife.

146. As a direct and proximate result of the MindGeek Defendants' violations of 18 U.S.C. § 2252A, Plaintiff has suffered substantial physical, psychological, financial, and reputational harm, including the harm described in Paragraph 96 above, and the MindGeek Defendants' conduct was knowing, willful, and in reckless disregard of Plaintiff's rights, entitling Plaintiff to injunctive relief, compensatory damages, punitive damages not less than $5,000,000, and reasonable attorneys' fees and costs pursuant to 18 U.S.C. § 2255.

**COUNT VI**

Unlawful Dissemination and Publication of an Intimate Image
(N.Y. Civil Rights Law § 52-b)
(Against the MindGeek Defendants)

147. New York Civil Rights Law § 52-b, effective September 21, 2019, provides a private right of action against any person or entity who, without the depicted person's consent, disseminates or publishes a still or video image depicting that person's intimate parts or sexual conduct, where the image was created or the dissemination occurred under circumstances in which the depicted person had a reasonable expectation of privacy.

148. Videos and images depicting Plaintiff, then a minor, engaging in sexual conduct, were disseminated and published on Defendants' websites, including Pornhub, RedTube, and PornMD.com, without Plaintiff's consent, beginning in or around December 2020 and continuing to the present, including through reuploads occurring after the effective date of Section 52-b.

149. Plaintiff had, and Defendants knew or reasonably should have known Plaintiff had, a reasonable expectation that the images and recordings at issue would remain private; they were created within the context of a private, intimate relationship and were never provided to Defendants or authorized for public distribution by Plaintiff.

150. Upon information and belief, Defendants disseminated and published this content for the purpose of harassing, annoying, and alarming Plaintiff, within the meaning of N.Y. Civil Rights Law § 52-b(1) — a purpose reasonably inferable from Defendants' knowing, repeated re-dissemination of the specific content identified in nine separate written notices sent December 7-9, 2020 (see Table A / Exhibit A), after actual notice that the content was non-consensual and depicted a minor, in a recurring pattern that served no legitimate business purpose other than to perpetuate Plaintiff's exposure and emotional distress notwithstanding her repeated demands for permanent removal, and corroborated by the extensive record of unsolicited third-party harassment Plaintiff has since received from members of the public who located and recognized her from the content at issue (**Exhibit E**). In any event, and independent of the purpose element addressed above, Defendants disseminated and published this content with reckless disregard for whether Plaintiff had consented, and continued to disseminate and publish it, through reuploads to Defendants' own and affiliated platforms, after receiving actual written notice from Plaintiff's counsel that the content was non-consensual.

151. Each reupload of content depicting Plaintiff to Defendants' platforms and affiliated platforms — including, upon information and belief, the reupload currently accessible at redwap.tv/xvideos/video-59774653/(REDACTED)-(REDACTED)-(REDACTED)-wife — constitutes a separate and independent act of dissemination and publication under N.Y. Civil Rights Law § 52-b, giving rise to a fresh and independently actionable violation and a fresh limitations period as to each such reupload, because each reupload republishes the content to a new audience, under a new URL, and beyond the scope of any prior notice or takedown. In the alternative, and upon information and belief, Plaintiff did not discover, and in the exercise of reasonable diligence could not have discovered, each instance of reappearance of the content at issue until such time as it was in fact located and reported, such that the applicable limitations period as to each reupload is tolled, or does not begin to run, until the date of Plaintiff's actual discovery of that specific reupload.

152. As a direct and proximate result of Defendants' violations of N.Y. Civil Rights Law § 52-b, Plaintiff has suffered substantial physical, psychological, financial, and reputational harm, entitling her to compensatory damages, statutory and punitive damages, injunctive relief, and reasonable attorneys' fees and costs. In the alternative, and regardless of the outcome of Plaintiff's damages claim under N.Y. Civil Rights Law § 52-b(1)-(2), Plaintiff separately invokes N.Y. Civil Rights Law § 52-b(4)-(5), which authorizes an order requiring any website subject to New York's long-arm jurisdiction to permanently remove a qualifying image without regard to intent to harass, annoy, or alarm; upon information and belief, Defendants' websites host and transmit the images depicting Plaintiff and are viewable in New York, subjecting Defendants to jurisdiction under subdivision five, entitling Plaintiff to an order requiring permanent removal of all such images reasonably within Defendants' control.

**COUNT VII**
(Misappropriation of Name, Portrait, Picture, and Likeness)
(N.Y. Civil Rights Law §§ 50, 51)
(Against the MindGeek Defendants)

153. Plaintiff incorporates by reference each allegation set forth above as though fully set forth herein.

154. By hosting, streaming, distributing, reuploading, and monetizing videos and images depicting Plaintiff, including on Pornhub, RedTube, and PornMD.com, and by placing paid advertising alongside that content, Defendants used Plaintiff's name, portrait, picture, and likeness for purposes of trade and advertising within the State of New York. Unlike claims premised on the generic use of a person's image, the economic value misappropriated here is tied specifically to Plaintiff's own individual identity: upon information and belief, Defendants' front-page featuring, search-indexing, and tagging of the content specifically by reference to Plaintiff's identifying characteristics caused the content depicting her, in particular, to generate identifiable advertising and referral revenue, distinguishing this claim from misappropriation theories rejected for failure to allege that the challenged use traded on the plaintiff's own particularized identity rather than her image in the abstract.

155. Defendants' use satisfies the "within the state" requirement because, upon information and belief, the videos and images depicting Plaintiff were concurrently and continuously accessible to, and were in fact viewed by, internet users physically located within the State of New York, including within this District, at all times material to this Complaint. See Molina v. Phoenix Sound, Inc., 297 A.D.2d 595 (1st Dep't 2002) (online display satisfies the "within the state" element).

156. Defendants' use also satisfies the "trade purposes" requirement because it constitutes "use which would draw trade to the [Defendants'] firm," Kane v. Orange County Publications, 232 A.D.2d 526, 527 (2d Dep't 1996): upon information and belief, Defendants displayed the content depicting Plaintiff, together with thumbnails and preview clips bearing her likeness, specifically to attract and retain viewer traffic to Defendants' websites, and Defendants' TrafficJunky advertising network sold and delivered geotargeted advertising to New York-based advertisers in connection with New York-based viewership of the content depicting Plaintiff, such that Defendants' use of Plaintiff's likeness directly drew commercial trade — in

the form of advertising revenue attributable specifically to New York viewership — to Defendants' firm.

157. Defendants did so without first obtaining Plaintiff's written consent.

158. Defendants knowingly used Plaintiff's name, portrait, picture, and likeness in the manner described above, entitling Plaintiff, in the jury's discretion, to exemplary damages pursuant to N.Y. Civil Rights Law § 51.

159. Each republication of the content depicting Plaintiff — including each reupload to a new URL, under a new title, or on a distinct affiliated platform such as PornMD.com or redwap.tv — constitutes a new and separate publication for purposes of N.Y. Civil Rights Law §§ 50 and 51, because each such reupload republishes the content to a materially new and distinct audience and was not a mere continuation of a prior, previously noticed publication, thereby giving rise to a separate cause of action and limitations period as to each reupload occurring within one year of the filing of this Complaint, without regard to the date of the original publication.

160. As a direct and proximate result of Defendants' violations of N.Y. Civil Rights Law §§ 50 and 51, Plaintiff has suffered substantial financial and reputational harm, including the loss of the commercial value of her own image, entitling her to compensatory damages, exemplary damages, injunctive relief, and reasonable attorneys' fees and costs.

## COUNT VIII

Negligence

*(Against the MindGeek Defendants)*

161. Plaintiff incorporates by reference each allegation set forth above as though fully set forth herein.

162. Defendants — including defendants Antoon and Tassillo, in their respective capacities as the executives with direct authority over content-moderation, trust-and-safety, and takedown-response practices — owed Plaintiff a duty of ordinary care, including a duty not to design, maintain, and operate a content platform in a manner that Defendants knew or reasonably should have known would foreseeably result in the posting, distribution, and continued availability of non-consensual and underage sexual content depicting identifiable individuals such as Plaintiff.

163. Defendants breached that duty by, among other things: maintaining, through defendant Urman's Video Sharing Platform product organization, an upload and "Model Program" "verification" process that required only a photograph of a person holding handwritten paper bearing a username and the word "pornhub.com," with no government-issued identification or independent age confirmation; disabling the specific reported URLs identified in Table A above between December 7 and December 9, 2020 without permanently deleting the underlying files, thereby allowing the content depicting Plaintiff to be reuploaded and to remain accessible today at redwap.tv/xvideos/video-59774653/(REDACTED)-(REDACTED)-(REDACTED)-wife; permitting content to be propagated from Pornhub to affiliated platforms, including RedTube and PornMD.com, without a corresponding mechanism for removal, as reflected in Pornhub Support representative "Kevin's" December 8, 2020 written disclaimer of responsibility for PornMD.com content; and failing to act on no fewer than nine separate written notices from Plaintiff's counsel between December 7 and December 9, 2020 identifying additional URLs depicting Plaintiff after prior reports had purportedly been resolved — a pattern of undetected and inadequately removed underage content that Defendants' own internal "TOS8 Audit," produced in related federal litigation, subsequently confirmed was neither isolated nor unknown to Defendants, having identified at least 38,132 CSAM videos and images across Defendants' platforms.

164. Defendants' breach of the duty of ordinary care was a direct and proximate cause of the substantial physical, psychological, financial, and reputational harm Plaintiff has suffered and continues to suffer, including the PTSD and Adjustment Disorder diagnosed on December 11, 2023, and the loss of the conditional law enforcement employment offers rescinded on August 2, 2024, and November 18, 2024.

**COUNT IX**
Deceptive Acts and Practices
*N.Y. General Business Law § 349*
*(Against the MindGeek Defendants)*

165. Plaintiff incorporates by reference each allegation set forth above as though fully set forth herein.

166. Defendants engaged in consumer-oriented conduct, directed at the public at large rather than solely at Plaintiff, by publicly representing to users, the press, and government bodies — including in Defendants' 2021 "transparency report" and public statements regarding their "Model Program" verification process and content-moderation practices — that Defendants employed effective age- and consent-verification measures and permanently removed reported unlawful content, when, upon information and belief, Defendants knew these representations were materially false or misleading.

167. These representations were materially misleading to a reasonable consumer, in that they were designed to and did reassure the public, advertisers, and payment processors that content on Defendants' platforms was lawfully obtained and consensual, when, upon information and belief, Defendants' own verification and removal practices were inadequate to support that assurance, as demonstrated by the continued presence and reappearance of content depicting Plaintiff notwithstanding Defendants' specific representations to Plaintiff's counsel that such content had been removed.

168. Upon information and belief, Plaintiff and her counsel specifically relied on Defendants' written December 2020 representations that the identified content had been permanently removed and fingerprinted, reinforced by Defendants' contemporaneous and subsequent public "transparency report" and "Model Program" verification claims described above, in determining not to pursue immediate litigation and in believing that the matter had been permanently resolved; that reliance was reasonable and foreseeable to Defendants and was misplaced because Defendants' representations were materially false when made. As a direct and proximate result of Defendants' deceptive acts and practices, Plaintiff was injured, including through the continued dissemination of non-consensual content that Defendants' public representations led her and her counsel reasonably to believe had been permanently addressed, entitling Plaintiff to actual damages, treble damages in the court's discretion, and reasonable attorneys' fees pursuant to N.Y. General Business Law § 349(h).

169. Plaintiff's injury under N.Y. General Business Law § 349 also includes the recurring cost, in time, money, and counsel fees, that Defendants' repeated false assurances of permanent removal forced Plaintiff to incur in retaining counsel to re-investigate, re-locate, and re-demand removal of the same content each time it reappeared — a transaction Plaintiff would not otherwise have needed to undertake had Defendants' representations been true, and which by itself constitutes cognizable economic injury under Section 349. Cf. Fleites v. MindGeek S.a.r.l., No. 2:21-cv-04920-WLH-ADS (C.D. Cal. Sept. 26, 2025) (sustaining an analogous unfair-competition claim against an economic-injury challenge where the "hopeless whack-a-mole situation" created by Defendants' unrestricted content business model required the plaintiff to hire an investigatory firm to track and demand removal of repeatedly reposted content, which the court held sufficient because plaintiff was "required to enter into a transaction, costing money or property, that would otherwise have been unnecessary").

**<u>COUNT X</u>**

Negligent Design

*(Against the MindGeek Defendants)*

170. Plaintiff incorporates by reference each allegation set forth above as though fully set forth herein.

171. Defendants designed, developed, and control the software, upload architecture, content-moderation systems, and inter-platform content-propagation systems (including the systems by which content uploaded to Pornhub is copied or made available to affiliated sites such as PornMD.com and RedTube) through which the content depicting Plaintiff was uploaded, distributed, and repeatedly reuploaded.

172. Upon information and belief, defendant Urman, in his capacity as Vice President of Product Management for the Video Sharing Platform, and defendant Bergmair, in his capacity as controlling beneficial owner with ultimate authority over resource-allocation decisions, approved and maintained a system design that omitted meaningful age- or consent-verification safeguards and lacked a reliable mechanism to permanently and universally remove reported content across all affiliated platforms — including the Vobile fingerprinting system that Pornhub Support representatives "Janie" and "Kevin" represented, in writing on December 7 and 8, 2020, had been applied to content depicting Plaintiff, but which, upon information and belief, could be and was circumvented by reuploading content from computers and email addresses not previously associated with Defendants, as a former MindGeek employee has

testified occurred in related federal litigation against these same Defendants — even though effective safeguards and mechanisms were technically and financially feasible, as demonstrated by the age- and consent-verification and content-removal protocols Defendants were subsequently required to implement under the FTC and Utah consent order in FTC & Utah v. Aylo Freesites Ltd., No. 2:25-cv-00752 (D. Utah, filed Sept. 3, 2025).

173. It was reasonably foreseeable to Defendants that a platform designed and operated in this manner — one that, upon information and belief, received approximately 42 billion visits in 2019 alone, with the United States as its top-visiting country and New York consistently among its top-visiting cities — would result in the posting and continued availability of non-consensual and underage sexual content depicting identifiable individuals such as Plaintiff.

174. Defendants' negligent design of these systems was a direct and proximate cause of the substantial harm Plaintiff has suffered and continues to suffer, including the harm described above.

**COUNT XI**

Civil Conspiracy

*(Against All Defendants)*

175. Plaintiff incorporates by reference each allegation set forth above as though fully set forth herein.

176. Upon information and belief, Defendants Bergmair, Antoon, Tassillo, and Urman, together with the corporate MindGeek Defendants, agreed, expressly or tacitly, to design, maintain, and continue operating a content platform and moderation practice that each knew would result in the posting and continued availability of non-consensual and underage sexual content, including content depicting Plaintiff, and to disclaim responsibility for content propagated to nominally separate affiliated entities such as PornMD.com in order to insulate the enterprise from liability for that content, while continuing to derive revenue from it.

177. In furtherance of that common scheme, Defendants committed the overt acts described throughout this Complaint, including the specific acts alleged in Counts I through X above, each of which independently gives rise to Defendants' liability for the underlying tort.

178. As a direct and proximate result of Defendants' civil conspiracy, Plaintiff has suffered substantial physical, psychological, financial, and reputational harm.

179. This civil conspiracy claim names multiple distinct alleged co-conspirators — the individual Defendants Bergmair, Antoon, Tassillo, and Urman, together with the corporate

MindGeek Defendants — and is therefore not subject to the intracorporate-conspiracy or single-actor limitations that have precluded conspiracy claims in related litigation against the MindGeek Defendants where, following the dismissal of other named defendants, only a single corporate defendant remained. See Fleites v. MindGeek S.a.r.l., No. 2:21-cv-04920-WLH-ADS (C.D. Cal.).

**COUNT XII**
Unjust Enrichment
*(Against All Defendants)*

180. This claim is pled in the alternative to, and does not waive, Plaintiff's claims for relief at law set forth in Counts I through XII above, to the extent any such claim is found not to provide an adequate remedy. Plaintiff incorporates by reference each allegation set forth above as though fully set forth herein.

181. Defendants have been financially enriched through the marketing, sale, streaming, and monetization of videos and images depicting Plaintiff, including through TrafficJunky advertising revenue generated by the front-page placement of that content, premium subscription revenue, and payment-processing fees, all without Plaintiff's knowledge or consent, and all while Plaintiff independently incurred out-of-pocket costs — including at least $960.00 in counseling fees paid to Melissa Schwartz, LCSW, LMFT — attempting to mitigate the harm Defendants' conduct caused.

182. It would be against equity and good conscience for Defendants to retain the benefit they have derived from the unauthorized use of Plaintiff's image and likeness, particularly where, upon information and belief, Defendants have since paid $5,000,000 immediately and agreed to a $10,000,000 suspended judgment to resolve government claims regarding these same business practices, see FTC & Utah v. Aylo Freesites Ltd., No. 2:25-cv-00752 (D. Utah, filed Sept. 3, 2025), and where a certified class of similarly situated plaintiffs has separately reached a $120,000,000 settlement with Defendants arising from materially the same conduct, see Jane Doe v. MindGeek USA Inc., No. 8:21-cv-00338-WLH-ADS (C.D. Cal.), yet Plaintiff individually has received no compensation for the specific harm Defendants caused her.

183. Defendants have been unjustly enriched at Plaintiff's expense in an amount to be determined at trial, an amount which, to the extent it is duplicative of any damages awarded on Counts I through XII above, Plaintiff does not seek to recover twice.

## PRAYER FOR RELIEF

184. WHEREFORE, Plaintiff K.F., individually and on behalf of the Classes, respectfully requests that this Court enter judgment in her favor and in favor of the Classes, and against Defendants, jointly and severally, as follows:

a. An order certifying the CSAM Class and the Removal Failure Class pursuant to Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3), appointing Plaintiff as Class Representative, and appointing Plaintiff's counsel as Class Counsel; and, in the alternative, to the extent New York substantive law is found to govern any Class member's state-law claims, certifying the same Classes pursuant to N.Y. C.P.L.R. §§ 901-909;

b. Permanent injunctive relief requiring Defendants to identify, locate, and permanently remove — across all Defendant-owned, Defendant-controlled, and Defendant-affiliated websites, including but not limited to Pornhub, RedTube, PornMD.com, and redwap.tv — all videos and images depicting Plaintiff and the Classes, including an order pursuant to N.Y. Civil Rights Law § 52-b(4)-(5) directing removal by any website subject to New York's long-arm jurisdiction, and enjoining Defendants from any future posting, distribution, or monetization of such content;

c. Compensatory damages in an amount to be determined at trial, including damages for physical, psychological, financial, and reputational harm, lost income, and lost career opportunities, on behalf of Plaintiff and the Classes;

d. Punitive and exemplary damages in an amount sufficient to punish Defendants' knowing and willful misconduct and to deter similar conduct in the future;

e. Civil damages under 18 U.S.C. § 1595(a) for Defendants' violations of the Trafficking Victims Protection Act; statutory damages available under N.Y. Civil Rights Law § 52-b; and treble damages available under N.Y. General Business Law § 349(h);

f. Liquidated damages of $5,000,000 per violation pursuant to 18 U.S.C. § 2255(a) for Plaintiff and each CSAM Class member who was a victim of a violation of 18 U.S.C. § 2252 or § 2252A, with each act of re-upload, re-distribution, or republication of qualifying content constituting a separate and independent violation and personal injury supporting a separate liquidated-damages award, in an amount to be determined at trial;

g. Pre-judgment and post-judgment interest as allowed by law;

h. Reasonable attorneys' fees, costs, and expenses of this action, including expert fees, as authorized by 18 U.S.C. § 2255, 18 U.S.C. § 1595, N.Y. Civil Rights Law § 51, N.Y. General Business Law § 349(h), and N.Y. C.P.L.R. § 909; and

i. Such other and further relief as this Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury on all issues so triable pursuant to Federal Rule of Civil Procedure 38(b).

Dated: August 16, 2026
Brooklyn, New York

Respectfully submitted,

*/s/ Tyrone A. Blackburn, Esq.*

Tyrone A. Blackburn, Esq.
T.A. Blackburn Law, PLLC
1242 E. 80th Street, 3rd Floor
Brooklyn, NY 11236
Tel: (347) 342-7432
Email: TBlackburn@TABlackburnLaw.com
Attorneys for Plaintiff K.F. and the Proposed Classes